# Exhibits to the Deposition of Timothy Ellerby

# EMPLOYEE ACKNOWLEDGMENT
# OF RECEIPT OF HANDBOOK

I acknowledge that I have received and read a copy of BB&T's EXCELLENCE Employee Handbook.

I understand, however, that the handbook is not a contract of employment. The policies and/or procedures set forth in the handbook are offered by BB&T as guidelines only. I understand and acknowledge that BB&T reserves absolute discretion to deviate from the policies or procedures set forth herein and to alter, amend, delete or revise the policies and/or procedures set forth herein as it deems appropriate and in the best interests of BB&T. *I understand and acknowledge that my employment with BB&T is an at-will employment. This means that my employment may be terminated at any time with or without notice by BB&T and I may quit my employment with BB&T at any time. Nothing in this handbook should be considered to alter the at-will nature of my employment with BB&T.* Finally, I understand and acknowledge that no one except the Chairman and Chief Executive Officer or his designee is authorized to alter the at-will nature of the employment of any employee at BB&T, and any such alteration must be in writing, signed by the Chairman and Chief Executive Officer or his designee and clearly state that the purpose of the writing is to alter the at-will employment relationship.

**Signature of Employee**

**Date** 3/8/2002

## *Please sign and date this receipt and give it to your manager for placement in your personnel file.*



EXHIBIT

Ellerby v. BB&T
CBS 000064



## Production

|  | Lender | | Region Avg Retail for FCMs | | Bank Avg Retail for FCMs | |
|---|---|---|---|---|---|---|
|  | # | $ | # | $ | # | $ |
| Total Closed Loans/Lines | 118 | $3,982.0 | 126.0 | $4,807.1 | 105.3 | $4,057.0 |
| Average per Month | 9.8 | $331.8 | 10.5 | $400.6 | 8.8 | $338.1 |

Lender Production Ranking: Middle 60%




## Profitability

### Credit Insurance

|  | Rate | Fee | Total Pricing Exceptions |
|---|---|---|---|
| Lender | 15.25% | 19.49% | 32.20% |
| Bank Avg | 16.24% | 7.81% | 22.01% |
| Bank Goal | | | (Max) 20.00% |

Pricing Exceptions

**Fees**
Collected: $9,414.9
Waived: $689.9
% Waived: 6.82%

**Penetration**

|  | Rate | Bank Avg |
|---|---|---|
| Life - Loans | 20.00% | 32.7% |
| Life - Lines | 24.10% | 15.9% |
| Life - Total | 22.83% | 23.4% |
| A&H | 18.18% | 18.3% |




## Credit Quality

### Beacon Credit Score Distribution

|  | # | % | Bank Avg |
|---|---|---|---|
| No Score | 0 | 0.0% | 1.8% |
| 1 – 619 | 3 | 3.4% | 4.4% |
| 620-679 | 26 | 30.5% | 20.7% |
| 680-719 | 30 | 33.1% | 23.1% |
| 720 + | 39 | 33.1% | 50.0% |

Bank Target <.7%

$ Charged-Off: $113,260.91

## Documentation Exceptions

% of Active Loans with uncleared exceptions:

| # of Uncleared Exceptions: | | Bank Avg | Goal |
|---|---|---|---|
| October | 241 | 30.1% | 14.4% | 10.0% |
| November | 241 | 10.0% | 14.3% | 10.0% |
| December | 254 | 32.9% | 14.1% | 10.0% |




## Policy Exceptions

|  |  | Bank Avg | Evaluation |
|---|---|---|---|
| Total Loans Reviewed | 77 | | |
| Major Process Errors | 25 | Errors per Loan: 0.506 / .393 | Fair |
| Lending Authority violations | 9 | | |
| Additional Errors | 28 | | |
| Reg B violations | 9 | Capacity Exceptions: 14.02% / 14.6% | |





## Lender Support Coapprovals

| Request due to: | Total Requests | | Bank | Approved | | Bank | Restructured | | Bank | Denied | | Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lending Authority | 15 | 55.6% | 60.1% | 8 | 53.3% | 80.8% | 5 | 33.3% | 7.8% | 2 | 13.3% | 16.1% |
| High Risk Grade | 12 | 44.4% | 39.9% | 7 | 58.3% | 43.3% | 1 | 8.3% | 9.3% | 4 | 33.3% | 47.3% |
| TOTAL | 27 | 100.0% | 100.0% | 15 | 55.6% | 65.8% | 6 | 22.2% | 8.2% | 6 | 22.2% | 26.0% |

*Produced by Direct Retail Lending*

000069

CONFIDENTIAL DOCUMENT
PURSUANT TO COURT'S PROTECTIVE



**BB&T**

Branch Banking and Trust Company
INTER-BRANCH CORRESPONDENCE

September 10, 2003

To: Sherri Harper
Regional Employees Relations Manager
Charlotte
407-954-3650

From: John P. Cole
Regional Retail Banking Manager
Regional Administration
Charlotte
704-954-1063
500-01-02-00



EXHIBIT
7

Re: The termination of Timothy Ellerby

Tim was terminated on August 22, 2003, justly. Tim made the decision repeatedly over the first eight months of 2003 to ignore the responsibilities to document his retail loans effectively. Upon his termination it was also discovered that this was a decision he had made for a number of years as he carried with him to the Woodlawn Branch numerous documents that should have long been recorded previously, from when he was the FCM at our Steele Creek office.

I met with a number Financial Center Managers and a small group of Retail Service Assistants on January 5, 2003 to share my concerns about documentation exceptions in our retail loan portfolio. At that meeting I made it clear that this was a short-term project that was to be completed by April 30th. The intent of the project was to reduce our retail loan exceptions in the region to fewer than 10%. The individual Financial Center Managers, including Tim, that were invited to this meeting had high rates of exceptions and they all understood the priority of this goal.

It is important to know that the reason for this project was the $100,000 loss the region incurred due to Tim not having perfected a deed of trust on a financed piece of real estate. While I wasn't happy to lose the $100,000, I realized more importantly, the significant risk our region had due to the number of liens we had that were not perfected. As Tim was the lender with the greatest number of these lien exceptions, he and I sat down and I shared with him my concerns over his lien and overall loan exception rates. This meeting was held on February 7, 2003 in the presence of Brant Standridge, the Financial Cluster Leader Tim reported to. At this meeting I made it exceptionally clear my concerns over the exception rate, and that if Tim did not get busy to clear these exceptions he would be terminated. No one could have possibly walked away from this meeting with any misunderstanding as to the seriousness, nor the consequences, of not meeting the 10% exception rate I had set as a target in January at the meeting Tim and others attended.

The region hit the 10% or less target rate in June, 2003. Tim was not terminated in May as I failed to write out a formal action plan that described the paragraph above.

Tim also received a Personal Development Plan in April that highlighted his lack of results with lowering his exception rate to an appropriate level. He earned a rating of "Growth Opportunity" and earned no salary increase. Once again, Tim had the opportunity to raise h concerns that he was not meeting the demands that had been set for him and seek additional assistance.

Ellerby Ter

Ellerby v. BB&T
CBS 000216

It is important to note that Tim received plenty of support to clear these exceptions over the first eight months of 2003. T. L. Saine, a retired lender who worked with us for many years, was temporally rehired to support the clearance of these exceptions. He was assigned to support Tim by me. He visited Tim on March 10, April 10, and July 11, 2003. Each time he would bring materials for Tim to deal with to clear his exceptions. As T. L. has said, "Tim never did anything that he said he would the previous time when I visited him. He just didn't do them." Additionally, Tim had the support of Gaylene Schiede from March, 2003 when she joined the cluster as the RSA.

Tim was informed and signed his written action plan that Chellie Phifer was forced to create for Tim as a final effort to make him see the importance of clearing these retail loan exceptions. This was created in July, 2003.

Tim Ellerby was terminated from the employment with BB&T due to consistent ignoring of a very specific goal that set for him. Tim was very aware of his responsibilities to clear these exceptions and was very aware that others were available to support him.

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

# BB&T PERSONAL DEVELOPMENT PLAN

| | | | | |
|---|---|---|---|---|
| Tim Ellerby | 6-month Review (Initials) | | | |
| EMPLOYEE NAME | | MGR. | EMPL. | DATE |
| Woodlawn/0055618 | Annual Summary by | BJS | (signature) | 02/15/03 |
| CENTER NAME/NUMBER | | MANAGER | | DATE |
| Agreement on Plan 2002 (Initials) MGR. EMPL. DATE | Summary Reviewed by | JPC | | 02/15/03 |
| PLAN YEAR | | MANAGER'S SUPERVISOR | | DATE |

## I. ORGANIZATIONAL VALUES AND CORE COMPETENCIES

*Important: The composite result of the following organizational values and core competencies directly impacts your professional reputation and credibility. The following categories were evaluated using the rating definitions found at the back of this form. Definitions for ratings should be reviewed with the employee prior to the discussion.*

### BB&T VALUES

1. **Reality Grounded/Reasoning:** Acts within the context of reality (the facts), as opposed to wishful thinking. Reasons logically from the facts at hand. Clear thinker. Begins with sound premises and draws conclusions in a rational manner.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

2. **Independent Thinker:** Makes rational decisions independently. Thinks creatively. Seeks innovation not to be different, but to be "better." Demonstrates the courage and self-confidence to stand up for beliefs and ideas.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | | X | |

3. **Productivity:** Committed to taking actions necessary to accomplish mission/goals. Turns thoughts into actions through proper planning, organizing, and execution. Sets priorities effectively and monitors timely completion of work. Provides services to clients in an efficient manner reflecting the value of the relationship. Able to handle multiple tasks and interruptions.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

4. **Attendance:** Displays promptness and good attendance.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

5. **Justice/Fairness:** Does not discriminate on race, gender, age, disability, nationality, religion, etc. Acknowledges superior performance. Treats everyone with dignity, trust, and consideration. Respects the individual.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

6. **Pride/Ownership:** Exhibits pride in work and accomplishments. Earns positive self-esteem from performing work well. Possesses strong personal goals and accomplishes goals within the context of the work unit and corporate missions. Possesses self-motivation and a strong work ethic including the initiative, energy, and desire to begin and complete assigned tasks. Exhibits personal commitment to, and accepts personal responsibility for, individual and work unit success.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

7. **Teamwork and Mutual Supportiveness:** Acts to achieve agreed upon objectives of the team with respect for fellow employees, while acting in a mutually supportive manner. Displays a willingness to "pitch-in." Supports corporate goals and philosophies.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | | X | |

### PROBLEM SOLVING & DECISION MAKING SKILLS

8. **Knowledge/Skills:** Possesses knowledge and skills necessary to perform assigned responsibilities in a competent manner. Acts on growth opportunities and pursues education/training to fill identified gaps. Works without close supervision.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

9. **Problem Solving:** Identifies problems in a timely manner. Gathers and analyzes information skillfully, sorting relevant from irrelevant information. Grasps essentials of complex issues, develops appropriate solutions, and initiates action.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

### INTERPERSONAL SKILLS

10. **Communication Style:** Communicates in an open, candid, clear, and consistent manner.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

11. **Listening Skills:** Listens effectively and probes for new ideas.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

12. **Diplomacy:** Influences others with or without direct authority. Uses facts and rational arguments to influence and persuade.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

### QUALITY & CLIENT SERVICE ORIENTATION

13. **Work Quality:** Produces high quality work and is attentive to detail and accuracy.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

14. **Process Improvement:** Continually evaluates, recommends, or implements process/system improvements. Accepts and handles change effectively.

| NII | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**EXHIBIT 8**

Ellerby v. BB&T
CBS 000046

**15.** **Client Service Delivery:** Follows BB&T's *Gold Seal Client Service Standards of Excellence* in greeting and servicing clients while performing daily responsibilities. Seeks to understand internal/external client needs and solicits feedback to enhance service quality and establish relationships.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**16.** **Telephone Skills:** Answers telephone using BB&T's *Telephone Answering Guidelines.* Maintains updated phone mail messages. Returns calls at earliest possible convenience.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

## PERSUASIVENESS/SALES *(required for employees with sales responsibilities; optional for others)*

**17.** **Sales Communication Skills:** Deals effectively with internal/external clients and other business relationships.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**18.** **Negotiating/Closing:** Can make things happen, negotiate, and "make a deal." Recognizes business opportunity and seizes it.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**19.** **Product Knowledge:** Possesses adequate product knowledge to meet client needs and support sales process.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**20.** **Sales Behaviors:** Follows Decathlon or other established sales process, using agreed upon sales techniques and behaviors.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

**21.** **Sales Goals:** Meets agreed upon sales goals on a consistent basis.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

## LEADERSHIP *(applies to employees with managerial and leadership responsibilities)*

**22.** **Vision/Motivation:** Develops and communicates a clear vision and direction for assigned unit/organization. Inspires and energizes others to commit to vision. Leads by example.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

**23.** **Forward Thinking:** Stretches horizons and challenges paradigms. Creates and manages real and positive change.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**24.** **Participative Management:** Involves the correct individuals in the decision-making process to ensure all important "inputs" are considered. Facilitates consensus agreement as appropriate.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

**25.** **Team Builder:** Selects and retains talented people. Encourages training and education. Constant interest in learning.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**26.** **Coaching:** Provides coaching and feedback to develop team members to fullest potential. Shares timely and objective feedback with assigned staff, including constructive feedback aimed at improvement. Sets objectives and conducts mid-year and year-end formal reviews on a timely basis. Inspects what is expected. *For managers with sales responsibilities:* Provides sales coaching and feedback on a "real-time", immediate basis.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**27.** **Delegation/Empowerment:** Delegates whole tasks and empowers team to maximum effectiveness.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

**28.** **Justice/Fairness (leadership aspect):** Evaluates and rewards employees objectively. Differentiates in the recognition of competency, performance, and character. Fully utilizes diversity of team members to achieve business unit success. Willing to make and act on difficult/tough decisions.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**29.** **Corporate Perspective:** Systems thinker with a cross-functional perspective. Considers global/corporate impact of decisions and actions. Communicates this perspective to team members.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

**30.** **Quality/Client Service Leadership:** Creates client service mindset throughout unit/organization. Inspires and demonstrates a passion for excellence in every aspect of work. Holds regularly scheduled service meetings. Emphasizes use of agreed upon service techniques and follows up to ensure proper execution.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | X | | | |

**31.** **Sales Leadership (required for managers with sales responsibilities):** Champions sales effort throughout unit/organization. Holds routine sales meetings, "Big 5's", objections clinics, etc. as necessary to support sales process and maximize effectiveness of sales efforts. Serves as a role model producer.

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | X | | |

## OPTIONAL

**32.** **Behavior/Skill/Competency:** _____
*(To be defined by manager)*

| NI | GO | P | VGP | EP |
|---|---|---|---|---|
| | | | | |

## Mid-Year Comments For Organizational Values and Core Competencies

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Ellerby v. BB&T
CBS 000047


PDP Tim Ellerby Year End 2002.doc

Case 3:04-cv-00149-RJC-DCK   Document 30-1   Filed 06/01/05   Page 7 of 39

Page 2 of 8

## II. OBJECTIVES

Attach Incentive Matrix Reflecting Ratings and Comments For Incented Positions In Banking Network, Lines of Business, Other Business Unit Plans, and Executive Incentive Participants.
(Use Additional Objectives Below As Necessary)

For All Other Positions, Use Objectives Below To Assess Results.

RESULTS *(For Incented Positions in Banking Network, Lines of Business, etc.)*

33.  Incentive Plan Performance: Individual performs at an acceptable level in assigned incentive plan, meeting or exceeding goals in most areas **(attach plan results/matrix).**

| NI | GO | P | VGP | EP |
|----|----|----|-----|----|
|    |    | X  |     |    |

List agreed upon objectives directly from the planning process, including the indicators of performance. Indicate results by checking appropriate block and comment as necessary. See back page for ratings.

### OBJECTIVE 1.
Produce the loan volume that is required to help the branch meets is budget goals for that category. Maintain good quality with the production that is done.

Year-End Review

| NI | GO | P | VGP | EP |
|----|----|----|-----|----|
| X  |    |    |     |    |

Comments:

In 2002 Tim was able to create $289,766 in funded loan production per month compared to a goal of $380,000. While these results are slightly lower than the banks goals, Tim's results were a 35% improvement over the $214,252 per month that he created in 2001. The team finished only slightly below target for loan growth for the year. Retail loan oustandings were $19,000 greater than 2001 compared to a goal of $84,000. It should be noted that although the branch production and growth are slightly below the goals that have been set for 2002 the production and growth represent a significant improvement over 2001. For example, in 2001 the branch experienced reatil loan growth of -10.3% . In 2003 Tim must continue to develop funded retail loans by using his pipeline to plan his weekly proactive activities, he must continue to coach his RB's and tellers to uncover potential retail loan opportunities, he must continue to work with IRM partners to create internal referral sources and he must work to develop more exteranal referral sources within community.

Tim's rate and fee exceptions percentage of 32.20% is well above the bank average of 22.01%. Tim must improve this percentage in 2003. This can be accomplished by doing an excellent job of providing value added service to his clients and charging them appropriately for that service. Tim, must also make Credit Life and A&H a more regular part of his arsenal. Tim's Credit Insurance penetration rate of 22.83% is slightly below the banks average. Based on the Beacon score distribution of Tim's loans it would appear that the credit risk of Tim's portfolio is slightly greater than the banks average. 34% of Tim's loans have beacon scores less than 679. This is compared to a bank average of 26.9%. As of 12/31/02, 32.9% of Tim's loan had uncleared exceptions. The bank and region goal is 10%. It is imperitive that Tim continue to use the resources that are available to bring his exceptions back in line with the regions target by the first quarter of 2003.

The Woodlawn market is most likely not a market that will produce tremendous retail loan volumes. With that in mind in 2003 Tim must work to price appropriately given the greater than average level of risk that he is taking. Tim must also work to increase his level of credit insurance penetration. Although loan production may be slightly below the target levels Tim can compensate for that by increasing the level of profitablility on each loan that he makes.

### OBJECTIVE 2.
Work with the RB team at Woodlawn to increase the team's ability to support the retail loan process.

Year-End Review

| NI | GO | P | VGP | EP |
|----|----|----|-----|----|
|    | X  |    |     |    |

Comments:

Tim currently has three RB's at the Woodlawn office. Of the three RB's, Jan Rendleman and Nena Curreton, were a members of the team for the entire year. During 2002 Jan Rendleman averaged 5 retail loan referrals and 2 closed retail loans per month. Nena Curreton averaged 2 retail loan referrals and .75 closed retail loans per month. In 2003 Tim must continue to coach his RB group to ask more broad based questions and specifically those questions related to the use of retail credit. If the Woodlawn team is to create the retail loan results necessary to achieve the goals for 2003 every member of the team must be on board.

### OBJECTIVE 3.
Proactively work to bring in new deposit opportunities. Work the top retail and business deposit list with relationship managers to help identify additional deposit opportunities.

Year-End Review

| NI | GO | P | VGP | EP |
|----|----|----|-----|----|
|    | X  |    |     |    |

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Ellerby v. BB&T
CBS 000048

Comments:

The Woodlawn team was able to far exceed the branches goal for Transaction Account growth. The branch grew transaction accounts by $2,400,000 over prior the year compared to a goal of $933,000. These are excellent results Tim, and you and your team should be very proud. The Woodlawn branch services a large number of very significant commercial clients on the deposit side. The team's hardwork with these accounts has paid off and is evident in the above mentioned results.

In the total deposit categories the branch did however loose ground from 2001. Total Local Sources less PF CD's grew by $525,000 compared to a goal of $3,851,000 and Total Local Sources Less CD's grew by -$479,000 compared to a goal of $3,687,000. In order to reverse this trend in 2003 several things must continue to happen. First, and probably most fundamentally, every team member within the Woodlawn office must take ownership of the financial results of the office and the financial needs of the branch's clients. Tim is already working to create this ownership by consitently sharing the finacnial results of the branch and then relating specific team behaviors and actions to the team's results. Second, the team must continue to focus on the branch's top depositors as a way of maintaining its current level and increasing deposits in the future. A portion of Tim's calls and his RB's calls must continue to be centered around the top depositors. Last, Tim must continue to work with business IRM partners to look for new business deposit opportunities within the market.

---

**OBJECTIVE 4.** Coach your sales team to profile the majority of clients that they come in contact with on a daily basis. This will help increase non-interest income opportunities for the branch.

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Year-End Review

| NII | GO | P | VGP | EP |
|-----|-----|-----|-----|-----|
|  |  |  |  | X |

Comments:

It is very evident in 2002 that the Woodlawn team did an excellent job of profiling a large percentage of clients that the branch came in contact with on a daily basis. This is evidenced by the specific results in two different categories.

First, in 2002 the Woodlawn branch did an excellent job of creating Non-Interest income opportunities for the branch. The branch was able to grow NII revenue by $183,000 over 2001 compared with a goal of $96,000. These results are outstanding and in relation to the goals set by the bank are a significant improvement over the results of 2001. In 2001 the branch did not meet its NII growth goal. These results are a reflection of the job that Tim has done re-establishing relationships with IRM partners such as the Investments Counselor and the Mortgage Lender. The branch exceeded is goals for the year in both mortgage loan income and investment revenue. In 2003, Tim should keep the same focus on relationship mangement as it is rolled out within the region. Make sure that those responsible for the management of your best customers, are doing so in such a way that enhances the clients relationship and your branch's performance.

Second, in 2002 the Woodlawn team was able to exceed their 5+ services household percentage goal. 27.40% of the branch's clients have 5+ services compared to a goal of 27.10% and compared to 25.20% in 2001. In 2003 the Woodlawn team must continue to support their clients with BB&T products and services.

---

**OBJECTIVE 5.** Manage expenses to support the regions profit goals for 2002.

Year-End Review

| NII | GO | P | VGP | EP |
|-----|-----|-----|-----|-----|
|  |  |  |  | X |

Comments:

The Woodlawn team was able to keep expenses below the goals established by the bank. The branch's expenses were $62,000 below the budgeted level. In 2002 Discretionary expenses decreased by $27,000 compared with a goal of an increase of $35,000. This is primarily a result of the significant decrease in the amount of charge offs due to check or account fraud. Tim and Jessica, the AOM, have done an excellent job of coaching both the RB's and Tellers on the steps to prevent the fraud from occurring. In 2003 Tim must continue to work with Jessica to keep the expenses of the branch under control.

---

**OBJECTIVE 6.** Work to ensure that all team members embrace and practice daily the concepts Gung Ho. Consistent focus on the BB&T mission and vision.

Year-End Review

| NII | GO | P | VGP | EP |
|-----|-----|-----|-----|-----|
|  |  | X |  |  |

Comments:

Tim has worked very hard to embrace the concepts of Gung Ho. This is evidenced by the significant improvements that the branch has made in the CSI scores. I believe that Tim has worked very hard to incorporate the BB&T mission, vision and values into the everyday operations of his branch. However, these beliefs require consistent reinforcement and in 2003 Tim must work to develop a plan to consistently involve these principles into every thing that he does from a leadership perspective. I truly believe that execution of this will be one of the fundamental keys to the ongoing success of the Woodlawn team.

---

**OBJECTIVE 7.** Work to ensure that the team understands and practices the fundamentals of the Gold Seal Standards

Year-End Review

| NII | GO | P | VGP | EP |
|-----|-----|-----|-----|-----|
|  |  | X |  |  |

Ellerby v. BB&T
CBS 000049

Case 3:04-cv-00149-RJC-DCK Document 30-1 Filed 06/01/05 Page 9 of 39

Comments:

The Woodlawn team has made excellent progress in the execution of the Gold Seal Standards as evidenced by the team's CSI score. In 2001, the team had a CSI score of 8.29 compared to a bank average of 8.70. In 2002 the branch had a CSI score of 8.98 compared to a bank average of 9.00. This is a significant improvement over the results of last year and can be directly attributed to Tim's leadership. In 2003 Tim must continue to use the Thursday morning PCE meetings to reinforce the fundamentals of client service. The Gold Seal standards will need to be continually embraced and made part of the weekly sales process.

## Mid-Year Comments For Objectives

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Ellerby v. BB&T
CBS 000050

## III. PERFORMANCE SUMMARY

Provide an overall summary rating using information from Section I: Organizational Values and Core Competencies and Section II: Objectives including any incentive matrices. This rating should represent a blend of ratings at the end of the form prior to completing this section. Comments should include a clear summary of strengths, weaknesses, and supporting information as to how the manager views the employee's total contribution over the last year. Please transfer this overall rating, along with any salary change information, to the HR Change Form for submission to your local HR Field Services office in Human Systems.

| NII | GO | P | VGP | EP |
|-----|----|----|-----|-----|
|     | X  |   |     |    |

### Year End Comments on Overall Performance

In 2002 Tim has made significant improvements in the the overall sales culture and team atmosphere of the Woodlawn branch. Tim has spent a tremendous amount of time this year coaching his team members as well as putting in place an effective and consistent sales process. The numbers have begun to reflect the positive changes that the branch has made under Tim's leadership. As of 12/31/02 the team had a matrix score of approximately 77.36 points. This is below the bank goal of 100 points however the team is very close to creating the results necessary to achieve the 100 point target. This is also well above the 49.02 points that were created in 2001. Great Job!!!!!

In order to continue that success in 2003 and take the team to the next level Tim must increase the focus in several specific areas.

First, Tim must do everything possible to control credit quality within his own portfolio. In 2002 past dues were at 3.446% and chargeoffs were at 2.301%. These numbers are much higher than the bank goals. In order control credit quality within the portfolio exceptions must be brought to within the regions standards. The current level of 32% is not acceptable. Tim currently has 93 lien exceptions within the portfolio. These lien exceptions represent significant risk to the bank. A $100,000 loan in Tim's portfolio has recently been completely charged off because a Deed of trust that was never filed. Tim must ensure that documentation on loans in the future and in the past are handled properly.

Second, Tim must do everything possible to increase the profitability of each loan made. The numbers would indicate that loan volume although improving is below the bank averages. The numbers would also indicate that the quality of the loans being produced is slightly than bank averages. With that in mind it is extremely important in 2003 that loans be priced accordingly. In 2002 only 68% of Tim's loans were priced according to sheet rate. In 2003 we must price in accordance to the risk that we are taking. Credit Insurance Penetration is also a way to increase the profitablity of each loan that is being made. A focus in this area in 2003 will make a tremendous difference.

Last Tim must do an excellent job of creating a team atmosphere at the Woodlawn branch. Tim must continue to take the time and effort to put the right people in the right position and coach those people accordingly. The individual results of each team member both old and new have improved over the past 12 months and it is a direct result of Tim's coaching efforts. However there is still work to be done. The financial results of the team should continue to improve as Tim continues to execute upon the sales structure that he has spent the last 2 years building.

Tim, over the past 12 months the financial performance of the Woodlawn has improved. However there are some fundamental issues that must be dealt with. In order to deal with these issues there specific things that will have to be changed going forward. You have the ability to make those changes. I will look forward to watching your progress.

## IV. LEARNING AND DEVELOPMENTAL ACTIVITY

A. Summarize any developmental activity during the last 12 months not shown on the Career Profile (attach copy of Career Profile).

CBT classes

B. Discuss the needs for personal or corporate attention to growth and development in specific skills, behaviors or emphases, noting highest impact areas as higher priority. If schools or classes are recommended, indicate specific expectations. Address each growth opportunity identified in sections I. and II. of this document.

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

## V. CAREER POTENTIAL

Comment on this person's ability to grow in current assignment (recognizing the value of experience and stability and long range potential).

Tim has worked very hard to continue to develop his leadership skills. With his leadership he has taken the Woodlawn team to a level of performance that is much greater than prior years. He has done that by working with his team to bring each member to the level of their true potential. As he continues to show stronger results he will get opportunities to move into a possible FCL role. Tim's loan output has improved significantly. As Tim continues to improve his personal production he will have the opportunity for roles outside of retail lending such as Small Business Banking and etc...

## VI. OPTIONAL EMPLOYEE COMMENT OR RESPONSE

## VII. GENERAL INFORMATION / CERTIFICATION

Current Position Title     Financial Center Manager II

Job Grade     13     Salary Range: Min $     39,829     Mid-Point $     50,783     Max $     61,737     Old Salary $     52,546

Salary Change Info:     New Salary $     52,546     Increase $     0     Increase %     0     New Compa Ratio %     103%

PERSONAL DEVELOPMENT PLAN RECEIVED BY     _Timothy Ellerby_ (EMPLOYEE SIGNATURE)     4/25/2003 (DATE)

---

### ANNUAL CERTIFICATION OF ADHERENCE TO BB&T CODES AND POLICIES
### (NOT OPTIONAL)

I certify that, as a condition of employment, I have read, understand and will abide by the BB&T Code of Ethics, BB&T's Policies on Non-Discrimination, and the BB&T Policy on Sexual Harassment.

Employee     _Timothy Ellerby_ (SIGNATURE)     4/25/2003 (DATE)

---

### RATING DEFINITIONS

**NII**    **Needs Immediate Improvement** - This level of achievement is considered to be below the minimum requirements for the position. Individual has difficulty meeting significant job expectations. An immediate and concentrated effort must be made to acquire and utilize an acceptable level of knowledge, skills, and behaviors for the individual to remain in the job.

**GO**    **Growth Opportunity** - This level of achievement can be further developed with experience, effort, training, and coaching. Individual performs in an acceptable way in many aspects, but has an opportunity to grow in others. May experience some difficulty in executing on responsibilities independently.

**P**    **Performer** - This level of achievement is considered to represent solid performance. Individual consistently and reliably meets job expectations and requirements. As the individual gains knowledge and experience, progress is being made in their overall development. Performance at this level is typical in well-managed, high-performance organizations.

**VGP**    **Very Good Performer** - This level of achievement is considered to exceed normal job expectations in many areas. Individual consistently accomplishes complex and difficult parts of the job, often going beyond anticipated results. Employee is making a substantial contribution to the organization.

**EP**    **Exceptional Performer** - This level of achievement is considered to be rare and distinguishes the employee from others. Individual excels in virtually all aspects and has attained a high level of proficiency on a sustained basis. Employee is considered to be a model for excellence and is described as a pacesetter and unique contributor.

Ellerby v. BB&T
CBS 000052





**BB&T**

Branch Banking and Trust Company
INTER-BRANCH CORRESPONDENCE

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

From: Chellie Phifer

To: Tim Ellerby

Re: 60 Day Performance Plan

Recent and past exception performance reports show noted weaknesses and deficiencies in you meeting your individual exception goals (see attached copy of PDP dated 2/15/03). These weaknesses and deficiencies continued after concerns were shared on the PDP. Even after the Retail Banking Manager implemented a specific plan, for the Charlotte Metro Region (January 2003), in which you were required to work with Retail Services Assistants to clear all of the lien imperfections within your loan portfolio, you did not meet the deadline of April 30, 2003 and to date that goal has still not been achieved. Effective immediately, you will be expected to give your package processing/submission and documentation exceptions your highest priority. Due to the fact that despite PDP reviews and other individual conversations regarding the severity of these issues and the need for immediate attention, your individual performance and results continue to fall short of the expectations stated. It has become necessary, to document, in writing, a Final 60-Day Performance Plan.

It is imperative that you correct all substandard areas of your documentation exception performance immediately and continue on an ongoing basis to maintain an acceptable level of performance.

It is a requirement to do the following:
- Your documentation exception rate must be below the following levels:
  8/21/03 (30 days) below 15.00%
  9/21/03 (60 days) below 10.00%
  Maintained at 10.00% or less beyond the 60 Day Plan period
- Sit down with your Financial Center Leader and Retail Services Assistant every Friday morning, following the cluster pipeline meeting and confirm progress made on clearing exceptions. Actions taken, dates, documents submitted, etc. that you provide will be noted by the FCL and RSA and compared to the bank's exception reports to confirm the progress that you are reporting is being completed and documented in the loan files.
- Honor commitments and appointments made with the FCL and RSA to complete the necessary work needed to correct the performance.
- Maintain a documentation exception rate of less than 10.00% for all new loans being produced. This rate will be calculated manually, each month, by the FCL based on new loans produced and exceptions noted on all new loan packages as they are processed.
- Send all Deeds of Trust to the RSA to be recorded, the day the loan closes. The RSA will see that they are picked up and recorded, to eliminate the risk of additional losses (See PDP).
- There can be NO "Reg B" violations on your declined loan packages.
- There can be NO "BP21" violations on loans that you have closed.
- Be proactive in following up with anyone necessary to insure that existing exceptions are being cleared.

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Due to the seriousness of the deficiencies and further potential risk of loss to the bank (See PDP), you and I will have formal follow-up meetings, every week within the 60-day plan, to review your progress with the outlined performance plan. If your performance is not at the expected level at each of the weekly reviews, your employment is subject to further disciplinary action up to and including termination.

There are many resources available to you including me. I am committed to your success and I look forward to working with you to improve your performance to an acceptable level.

Employee Comments:

_____

_____

_____

_____

The above has been discussed with me by my supervisor and I understand that a copy of this memorandum will be placed in my personnel file. I also understand that any further performance issues may result in disciplinary action up to and including termination of my employment.

_____ 7/21/03          _____ 7/21/2003
Chellie L. Phifer                          Tim Ellerby
Financial Center Leader                Financial Center Manager
July 21, 2003                              July 21, 2003

Cc:     Personnel File
        John Cole

60-Day Action Plan Review Log    Tim Ellerby


CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

**7/21/03**

Met with Tim Ellerby to present the action plan. The plan was agreed to and Tim Ellerby signed and accepted the terms of the plan and the consequences of not meeting the plan.

**7/25/03**

Met With Tim Ellerby at his branch to get an update on the progress made in a few of the exception areas of his portfolio.

- I specifically asked him about past due invoices for Mid-Atlantic Title. The Retail Loan Department in Winston-Salem had asked our Retail Banking Manager and I to determine the status of these invoices, as some are more than a year old. Tim confirmed that the final opinions represented by these invoices had been received and that all invoices had now been paid. I asked Tim for a date that the invoices and payments were sent to Mid-Atlantic. Tim looked through some of his notes but was unable to locate the date. I asked that Tim continue to look for the date and confirm the date sent with me via e-mail, when located. Tim confirmed that he would do that.
- I specifically asked Tim about the Deeds of Trust that still remain unrecorded and on his "uncleared documentation exception" report, to this date. Tim stated that 10 Deeds of Trust were submitted to the Register of Deeds office on July 3rd to be recorded and returned to him. Tim stated that 10 additional Deeds of Trust had been received from the Register of Deeds Office and that he had forwarded them to the Retail Loan Operations area on July 23, 2003. Tim also stated that there were 8 additional exceptions that he was working with a closing attorney to clear (Final Title Opinions, recorded Deeds of Trust, etc.)

**8/1/03**

The Financial Center Leader was on vacation from 8/1/03 - 8/6/03 and in a training class on 8/7/03, unable to meet with Tim.

**8/8/03**

Tim was on vacation for the day, so an appointment time of Tuesday, 8/11/03 was scheduled to review Tim's progress with the plan.

**8/12/03**

The Financial Center Leader, Tim, and the Retail Services Assistant sat down to review the current exception list, document progress made, and question information provided to the Financial Center Leader on 7/25/03. Tim's documentation exception rate remains at 20%, despite Tim reporting on 7/25/03 that documentation was sent to clear ten of these exceptions. Loan operations has not reflected receipt of those reported documents by clearing the corresponding exception from his report. The Financial Center leader questioned Tim about the Mid-Atlantic payment date, again, as Tim never e-mailed her to confirm the date that payment was sent to them, as he committed to on 7/25/03.

Ellerby v. BB&T
CBS 000194

EXHIBIT

12

PEW040-00C-031-6889

8/12/03 (continued)
After reviewing the documentation exception list, Tim committed to the following actions :

See attached Documentation Exception Report

8/21/03
Today marks the first date outlined in the action plan that requires specific results as compared to the goals set.

Due to the fact that the automated reports are only created at month-end, Gaylene (RSA) and I contacted Loan Operations to request their assistance in reviewing received documentation, items cleared, and to calculate a documentation exception rate as of 8/21/03, based on those factors. This will provide Tim with the opportunity to have every possible cleared item removed from the report and factored into the ratio calculation right up through the deadline of 8/21/03.

After reviewing our reports and combined notes with Loan Documentation and verifying cleared items, the department was able to confirm that as of 8/21/03, Tim's portfolio contains 424 loans and that the total number of documentation exceptions that remain outstanding are 70 (this number is down from 85 – which equates to the 15 cleared in the last 2 weeks – Gaylene – 13 Tim- 1 Payoff Cleared 1 –see attached report).

Unfortunately, that equals an exeption ratio of 17%, which is above the guideline set for Tim in the Action Plan of 7/21/03 (see attached copy).

8/22/03
I met with Tim to determine the status of the items he committed to clearing in the last two weeks that remain on the report (see notes on attached report). Basically the same "promises" were made to act on these items, next week.

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

Ellerby v. BB&T
CBS 000195

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

# J. Eric Kindberg, Attorney At Law  /Beth/

## 1101 Tyvola Road, Suite 202
## Charlotte, NC 28217
### 704-665-6363
### 704-665-9090

August 4, 2003

To:        Tim Ellerby

Re:        Attorney Fees/ recording Fees
           Bridges, John Curtis  90/ 3833 432-6001 (Joyce
_____ Baldwin, Frederick
—— Goodman, Glenn Davis
           Goodman, Glen Davis
—— Ballard, Jerry H.
—— Weems, Robert  need
—— Caldwell Jerry
—— Sopher, Christopher  need
—— Langford, Philip
           Wilson, Anne
—— Keating, Sean Patrick
           Maisel, David
           Wilson, Caudle

| | |
|---|---|
| Recording Advance: | $408.00 |
| Document Review: | $100.00 |
| Courier Service | $13 @ 10.00 130.00 |
| Total | $638.00 ——> to record & recording fees |

Please forward A.S.A. P so that we can clear this off the books. Thanks!

THANK YOU FOR YOUR BUSINESS.

EXHIBIT
| U

FEB 540 520-331-2989

Ellerby v. BB&T
CBS 000219

CONFIDENTIAL DOCUMENTS PRODUCED
PURSUANT TO COURT'S PROTECTIVE ORDER

12-8-80
FITE
6058618
FCM II
D/A

_file sent to_
_Stephanie Schulz_
10-2-93
_David Thomas_

# BB&T

## HUMAN SYSTEMS STATUS CHANGE:  ☐ Leave of Absence  ☒ Termination 4-5-01

_AB_

| Social Security Number | Org. Code | Effective Date |
|---|---|---|
| 7 3 7 7 5 6 5 3 1 | W C | 0 8 2 2 2 0 0 3 |
| | | m m  d d  y y y y |

| 1st Name | First Name | Middle Initial | Suffix |
|---|---|---|---|
| E L L E R B Y , | T I M O T H Y | W | |

## LEAVE OF ABSENCE

☐ 02 LOA with Pay   ☐ 03 LOA without Pay   Last Day Worked: _____

Expected Return Date: _____

reason: _____

LOA REASON (Check One):
☐ 01 Disability
☐ 02 Military
☐ 03 Maternity, Paternity
☐ 04 Personal
☐ 05 Other Illness
☐ 06 Family Obligations
☐ 07 Education
☐ 08 Layoff
☐ 09 Contract

number of days absent with pay during the calendar year through the last day
worked, for sickness, sickness in family, death in family, etc. (HS Policy #702): _____

Vacation Pay Instructions: _____

☐ 04 Return from Leave of Absence   Date Returned: _____

## TERMINATION OF EMPLOYMENT

☒ 05 Termination of Employment

resignation, date notice was given: _____

Vacation Days Eligible: 20   Vacation Days Taken: 8
(Accrued for slary) Per C. Phifer

Last Day Worked: 8/22/03
Length of Notice: N/A
Vacation Days Due: 4
Severance Days: 30
Other Pay: _____

Forwarding Address: 6028 Downfield Wood Dr. Charlotte NC 28269
Street   City   Zip

reason Employee Is Leaving (Be Specific): _Employment Terminated by BB&T. Employee failed to meet expectations of a final 60 day action plan. See file for full documentation._

Exit Interview Comments: _Could not believe we were not giving him another chance. He stated that anyone else with the same results as him had been given a 2nd or 3rd that he. hopes that I realize that I will regret this decision._

## HUMAN SYSTEMS USE ONLY

Rehire Eligibility: ☐ Yes  ☒ Yes / Conditional  ☐ NO

Separation Reason Code: 221

Pay End Date: 0 9 2 6 2 0 0 3   (09262003)
m m  d d  y y y y

## APPROVALS

_____   9/2/03
EMPLOYEE'S MANAGER (SIGNATURE)   Date

Debbie L. Phifer 901 954 2099
PREPARER'S NAME & PHONE

_____   9/2/03
Date

_____
MANAGER / MANAGER (SIGNATURE)

Shawn B Harper   9/15/03
HUMAN SYSTEMS   Date

EXHIBIT

Ellers v. BB&T
CBS 030003



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## CIVIL ACTION NO. 3:04-CV-149

TIMOTHY N. ELLERBY,

          Plaintiff,

vs.

BRANCH BANKING & TRUST COMPANY,

          Defendant.

## D E P O S I T I O N



### WITNESS:  CHELLIE PHIFER

TAKEN AT THE OFFICES OF:
BRANCH BANKING & TRUST COMPANY
1263 Arrow Pine Road
Charlotte, NC   28202

DATE:  04-26-05
TIME:  10:02 A.M.

## REPORTER:  DEBORAH C. CONWAY
## CHAPLIN & ASSOCIATES, INC.

CHARLOTTE (704) 335-1954   TRIAD (336) 992-1954   RALEIGH (919) 807-1954

1          A.    Uh-huh (yes).

2          Q.    Do you remember what your job title was

3     then?

4          A.    At the time I came in to BB&T I was a

5     branch manager, and my corporate title was banking

6     officer.

7          Q.    Were you assigned to any specific

8     office?

9          A.    The Queens Road office is where I began

10    with BB&T.

11         Q.    And were you promoted after that?

12         A.    Yes.   The structure of BB&T and its

13    branches changed somewhat in the next couple of

14    years that followed my joining BB&T.   And the

15    position that I'm currently in was created and the

16    position that I was in at Queens Road was created,

17    and that was financial cluster leader.

18         Q.    Now could you describe for me in detail

19    what that means?

20         A.    Uh-huh (yes).   The position was created

21    by the bank because my boss had numerous amount of

22    direct reports.   And in order to be more effective

23    within the region, they named financial cluster

24    leaders and then geographically designed those

25    clusters to include certain branches.   And then

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

Case 3:04-cv-00149-RJC-DCK   Document 30-1   Filed 06/01/05   Page 20 of 39

1       folks that were in my position in the financial

2       cluster leader branches, the managers of those

3       other branches within the cluster would report

4       directly and be supervised directly by that

5       financial cluster leader.  Some kind of another

6       layer of management, I guess, added.

7           Q.    You mentioned that the person, I guess,

8       that had all the responsibility initially was that

9       Mr. Cole?

10          A.    Yes.

11          Q.    Okay.

12          A.    Uh-huh (yes).

13          Q.    And how many of these cluster leaders

14      report to Mr. Cole?  We could move it right up to

15      the year 2003.

16                  MR. NEWTON:  Well, are you asking

17      her 2003 how many were reporting or ---

18                  MR. BOLDUC:  Yes, 2003, that's

19      right.

20                  THE WITNESS:  The best I can recall

21      roughly 12, I think.

22          Q.    (Mr. Bolduc)  And the structure just

23      below cluster leader is what?

24          A.    The -- I can tell you who directly

25      reported to me as a result of me being that

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

Case 3:04-cv-00149-RJC-DCK  Document 30-1  Filed 06/01/05  Page 21 of 39

1      the South Park cluster.

2          Q.   Do you think Mr. Ellerby had good people

3      skills?

4          A.   I mean, I guess, overall.  I don't know

5      if you're in a specific situation or...

6          Q.   Just generally, is he gregarious, kind

7      of a salesman type guy?

8          A.   I would think so; yes.

9          Q.   Can you tell me what offices

10     specifically your cluster consisted of?

11         A.   The South Park cluster -- and it's a

12     little bit different now, so do you want now or do

13     you want then?

14         Q.   Actually, let's go to -- if I don't ask,

15     it's going to be 2003.

16         A.   Okay.

17         Q.   We're at 2003 right up until 2004.

18         A.   In 2003 the South Park cluster consisted

19     of the South Park branch, where I was physically

20     located; the Woodlawn branch; the Providence Road

21     branch.

22         Q.   Okay.

23         A.   And the Monroe Road branch.

24         Q.   So how many people is the RSA

25     supporting within those four branches?

---

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

Case 3:04-cv-00149-RJC-DCK  Document 30-1  Filed 06/01/05  Page 22 of 39

1          A.    Yes, sir ---

2          Q.    --- because the ---

3          A.    --- you would, because it's the bank's

4     policy for the lender to drive that operation.

5          Q.    But absent the bank's policy, it's

6     possible to get it done, an RSA could get the

7     exceptions done all on her own without any help

8     from the lender, correct?

9          A.    If you're asking me if it's possible,

10    it's not something that I would do simply because

11    that's not the bank's directive.

12         Q.    I'm asking -- I'm saying, absent, you

13    know, the bank's policy.  I understand the bank's

14    policy.  It's possible for an RSA to go ahead and

15    clear the exception without any help from a

16    lender, correct?

17         A.    In most cases, yes.

18         Q.    Do you have any idea why Mr. Ellerby

19    never had an RSA prior to the year 2003?

20         A.    I can't answer specifically other than

21    as I mentioned before, this was a -- kind of a new

22    creation, a new evolution of this process.

23    Initially the bank had it set up that if you

24    reached a certain level of production, then you

25    warranted having that assistant.  And prior to the

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

Case 3:04-cv-00149-RJC-DCK  Document 30-1  Filed 06/01/05  Page 23 of 39

1    new structure that we created, Tim did not create

2    that particular level of production.  And

3    therefore, the assistant that was in the South

4    Park branch focused specifically on that top

5    producing lender, because that's the way the bank

6    had previously had it structured.  But then it

7    began to evolve as positions became -- as they

8    created the RSA position, and positions that came

9    available in those clusters everyone that would

10   come into that role knew they would begin

11   structuring it that they supported every lender in

12   the cluster.

13        Q.    Do you remember what that threshold

14   level was in terms of loan production?

15        A.    Roughly a million dollars a month.

16        Q.    So it was done on a monthly basis?

17        A.    Our production is measured on a monthly

18   basis, yes.

19        Q.    So if somebody were to produce five the

20   first month and then a hundred thousand the next

21   three or four months, you may not qualify?

22        A.    Right.  And it wasn't a matter of

23   qualifying, because it wasn't a performance

24   measure.  It wasn't that, you know, if you had a

25   million it was right and if you didn't have a

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1      familiar with.  I'm talking about our monthly

2      branch sales leaders meeting.

3          Q.   Okay.  So you have no recollection of

4      that taking place; Tim giving a report, coming

5      back to a table and then John...

6          A.   I mean, I'm not saying that it couldn't

7      have happened that he maybe stood up there and

8      gave some kind of presentation that maybe I don't

9      recall.  But no, I don't recall the presentation

10     nor their interaction.

11         Q.   Tell me about the 60-day performance

12     plan; how did that come about?

13         A.   As I mentioned earlier, that came about

14     as the result of us focusing two different retail

15     services assistants working with Tim to reduce not

16     only the lien exceptions but the overall loan

17     documentation exceptions.  And it became apparent

18     that despite the promises made on the part of Tim

19     and the commitments made, that he was not

20     following through on those promises or

21     commitments.  So we needed a very directed,

22     specific action plan to get him where we needed

23     him to be.

24         Q.   And whose idea was that plan?

25         A.   That plan was my idea.

1          Q.   Do you know ---

2          A.   Because they wouldn't come and tell me

3     that.   And since, obviously, would not have

4     involved someone in my cluster I would not have a

5     knowledge of that.

6          Q.   Would Mr. Cole know?

7          A.   I would assume; if they reported to him,

8     I would assume they would.

9          Q.   As far as the plan goes, who came up

10    with the idea of 15 percent after 30 days and then

11    ten percent after 30 days?

12         A.   Fifteen percent after 30 days and ten...

13         Q.   The goal to get the 15 percent after 30

14    days and the ultimate goal to get to ten percent?

15         A.   Right.   I did.   And I can give you the

16    specific reason as to why I did.

17              As I mentioned, in implementing the

18    action plan, there were two goals here.   One was

19    the actual rating itself and getting that

20    documentation exception rate where it needed to

21    be.   The other was that I could not count on the

22    information that Tim was giving me to be truthful

23    and accurate.   And so basically in an effort to

24    get this corrected and to work with him and

25    support him to get corrected, it became important

1    to structure the plan -- or I felt it was

2    important to structure the plan that way, so that

3    we could not only reduce the rate, but so that we

4    would have a very specific follow up to the steps

5    being taken to reduce that rate.  I felt like not

6    only did we need a check and balance for the rate

7    itself, but I need a check and balance system to

8    make sure that what he was committing to me that

9    he was going to do that he did, because that had

10   not been the previous history.

11          So it was structured that way, quite

12   honestly, to give him more of an opportunity.  I

13   didn't think it was right to say in 30 days it has

14   to be down to ten percent.  I felt like we could

15   -- could make it a process and extend it a little

16   but further than that, which is why we did the 60

17   days.  But it was very necessary to see that

18   progress was being made with the commitments and

19   follow through on his part.  And so that was an

20   opportunity to give him a chance to prove that

21   portion of it in that 30-day period.

22          Q.    Now you would agree that it takes time

23   to clear exceptions?

24          A.    Some of them; yes.

25          Q.    Can you ---

1    percent down to about 20 in July?

2          A.    I don't recall.  I guess, roughly; yeah.

3          Q.    Now, Gaylene was assisting him for

4    roughly about four of those months?

5          A.    Uh-huh (yes).

6          Q.    Did her role change at all once you

7    instituted this 60-day plan as far -- was she

8    working for him exclusively ---

9          A.    No.

10         Q.    --- at that point?

11         A.    No.  But she was providing more time to

12   him in terms of, as I said, we sat down on a

13   weekly basis and she provided information.  She

14   consistently communicated with the retail loan

15   services area to be able to communicate back to us

16   on Fridays everything that had cleared.  And --

17   which is when most of the discrepancies occurred,

18   because Tim would continue to provide us with the

19   information on the things that he had taken care

20   of, or cleared, but never came to light.

21         Q.    That's it for this document.

22                        (DEPOSITION EXHIBIT

23                         NUMBER 12 WAS MARKED

24                         FOR IDENTIFICATION)

25                         Plaintiff's Exhibit 12.

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

Case 3:04-cv-00149-RJC-DCK  Document 30-1  Filed 06/01/05  Page 28 of 39

1    argumentative to suggest it that way.

2                      THE WITNESS: And maybe looking the

3    other way is not the right statement. But I guess

4    in your questions, you continue to ask me,

5    "couldn't I just have allowed him to continue not

6    performing? Couldn't I have just given him more

7    help to further allow him to continue to not

8    perform?" And I guess, sitting here in front of

9    you today, to me that equates to looking the other

10   way. And no, that was not something that I could

11   do.

12        Q.    (Mr. Bolduc) Is that based on the

13   directive from Mr. Cole at the beginning of the

14   year, that the exceptions had to be down. Is that

15   why you put him on that plan?

16        A.    No. I put him on the plan not only

17   because his number continued to be significantly

18   above, but as I mentioned earlier, a significant

19   part of that plan was the willingness and the

20   ability to perform to get those things resolved.

21                      Again, you asked me could I have made a

22   different decision on that day? If I had seen his

23   willingness to participate and the follow through

24   on the commitments he made, then yes, that would

25   have -- that would have given me a lot more leeway

Chaplin & Associates, P. O. Box 407, Kernersville, NC 27285-0407 (336) 992-1954

1    with the bank to go back to someone and make the
2    argument that, yes, he's only a couple of percent
3    away.  But he is really trying hard, he's doing
4    everything he possibly can to make this happen.
5    Then, I don't know what the outcome would have
6    been, but I would have had more of an argument
7    that way.  But that was not at all the case.
8              And so the decision was not based -- I
9    guess this is the answer to your question, the
10   decision was never to implement the plan, to
11   terminate Tim was never based solely on a number.
12   It was based on his overall performance, his lack
13   of commitment, lack of willingness to make it
14   right.
15        Q.   But if you say his overall performance,
16   in general, looking at it from any bank's point of
17   view they would generally look at loan production.
18              MR. NEWTON:  Objection to the form
19   of the question.
20              THE WITNESS:  That would be a piece
21   of it, yes.  And obviously, I didn't put him on a
22   plan for loan production, I put him on the plan
23   for exceptions.
24        Q.   (Mr. Bolduc)  Did you take that into
25   consideration, that he was a doing a good job in

04-26-05          Ellerby v. BB&T\3:04CV149          COPY

Case 3:04-cv-00149-RJC-DCK  Document 30-1  Filed 06/01/05  Page 30 of 39

1    is that correct, that this became a problem?

2         A.    I don't know that.  As I mentioned

3    earlier, I can't answer to what the make up of

4    those high numbers were before he began reporting

5    to me.  You know, it may have been a case like

6    Brian Gurzenski's where he -- because he did work

7    in several branches.  And maybe he moved and

8    inherited someone's portfolio, and the same

9    consideration would have been given to him to

10   allow him time to get that under control.

11   Especially since they were documentation

12   exceptions that he did not generate.

13        Q.    Did you ever consider a different

14   opportunity for him within the bank?

15        A.    No.  And I'll tell you the reason.  I'm

16   sorry.  No.

17        Q.    What would that reason be?

18        A.    Again, I did not feel like the

19   commitment, the willingness to perform and follow

20   through on the commitments made was there.  And so

21   that would not be unique just to this position;

22   that would flow through into any other position.

23        Q.    But you agree that the commitment that

24   you're talking about was specifically to

25   exceptions, correct?

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### Civil Action No. 3:04 CV 149

TIMOTHY N. ELLERBY,     )
                               )
      Plaintiff,         )
                               )
v.                         )      **DECLARATION OF**
                               )      **CHELLIE PHIFER**
BRANCH BANKING & TRUST     )
COMPANY,                )
                               )
      Defendant.       )
_____)

1.     My name is Chellie Phifer, and I am of sufficient age, have a sound mind, and suffer from no disabilities that would prevent me from giving this Declaration.

2.     I am employed by Branch Banking and Trust Company ("BB&T") as a Financial Center Leader. A Financial Center Leader supervises branches within a particular geographic area, known as a "cluster." I am responsible for supervising branches in the South Park "cluster," which consists of approximately four branches that are located close to the South Park branch where I am located.

3.     In 2003, the branches in the South Park cluster (and for which I was responsible) were South Park, Woodlawn, Queens Road, and Providence Road.

4.     From approximately March of 2003 until August 22, 2003, I was the direct supervisor of Timothy N. Ellerby, who was the Financial Center Manager at the Woodlawn Branch. Prior to that time, Ellerby reported to Brant Standridge. Both Standridge and I reported to John Cole, the Regional Retail Banking Manager.

5.     In July of 2003, I placed Ellerby on a 60-Day Performance Plan. I designed the Plan to address Ellerby's poor performance on "exception rates."

6.     There are two types of exceptions: Loan Documentation Exceptions and Lien Exceptions. Loan documentation exceptions occur when there are defects in loan paperwork, such as incomplete contact information, missing signatures, missing forms, incomplete forms, erroneous calculations, etc. Lien exceptions occur when the bank does not perfect its security interest(s) in collateral that secures the particular loan at issue. Loan documentation exceptions are generally not as serious as lien exceptions, in that they do not affect the bank's interest in any collateral.

7.     Ellerby had a significant number of loan documentation and lien exceptions, and I implemented the July Performance Plan for two reasons. First, although Ellerby's exception rate had decreased since February, it was not decreasing as fast as I thought it should. More importantly, however, I believed that despite the emphasis that BB&T was now placing on decreasing the exception rate, Ellerby was simply not taking ownership over this effort.

8.     In addition to my own observations, I relied heavily upon information supplied to me by Gaylene Scheide, an RSA who worked for me and who was tasked with the responsibility of helping the lenders in my cluster with loan documentation and their exception rates.

9.     Scheide updated me regularly on her efforts to clear outstanding exceptions and informed me that Ellerby was not following through with his commitments regarding clearing exceptions and not doing the "leg work" (i.e., gathering necessary documentation, calling clients to get the necessary information, interfacing

2

with attorneys and courts regarding filing of Deeds of Trust, UCC Financing Statements, and the like) to clear these exceptions.

10.     Scheide told me that her efforts to clear these exceptions were greatly hampered by Ellerby's lack of cooperation. In essence, Scheide told me that she was clearing the outstanding exceptions in spite of Ellerby and certainly not with his assistance.

11.     I was concerned about what I heard from Scheide (as well as my own observations) and thus believed that I had to institute a more structured approach regarding this matter. Accordingly, I implemented the 60-Day Performance Plan. Under the terms of the Plan I implemented, Ellerby's exception rate had to be no greater than 15% by August 21, 2003, and no greater than 10% by September 21, 2003. I also set forth in the Plan that Ellerby needed to cooperate with Scheide and me to clear these exceptions, and follow through with his commitments in this area.

12.     Ellerby, Scheide and I met weekly to review his exception report and work together toward clearing outstanding exceptions. As part of my monitoring efforts, I prepared a "60-Day Action Plan Review Log" detailing the results of our weekly meetings with Ellerby. This Log is set forth as Exhibit 12 to Ellerby's Deposition.

13.     Ellerby did not meet the goals I set forth in the Plan. More specifically, Ellerby failed to meet the required exception rate of 15% by August 21, and also failed to take ownership or exhibit the appropriate level of initiative with respect to insuring that his exceptions were cleared.

14.     During this process, Scheide once again reported to me that Ellerby was not following through with his commitments, and was actually hindering her from

3

clearing more of the exceptions. This was consistent with my own observation of Ellerby, in that he did not follow through with commitments he made to Scheide and me in our weekly group meetings. In that regard, when we would meet, Ellerby would tell me one thing and then the next time I addressed the subject with him, his story would change or he would offer excuses for why he did not honor his commitments.

15. Because of his failure to meet the expectations set forth in my performance plan, I believed that Ellerby was not fulfilling his duties and responsibilities as a Financial Center Manager for BB&T, and therefore his employment should be terminated

16. I informed John Cole, the Regional Retail Banking Manager and my direct supervisor, of my recommendation and the reasons for that recommendation, and Cole approved my decision.

17. Ellerby had a much higher exception rate than any other Financial Center Manager in my cluster (and that I supervised). Moreover, none of the lenders that I supervised displayed such a lack of initiative or ownership over the bank's efforts to clear outstanding exceptions. For example, Scheide reported to me that the other lenders were helpful and cooperative in their efforts to clear outstanding exceptions on their particular loan portfolios. This was simply not the case with Ellerby.

18. I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of May, 2005.

Chellie Phifer

4

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## Civil Action No. 3:04 CV 149

| | |
|---|---|
| **TIMOTHY N. ELLERBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **DECLARATION OF** |
| | ) **GAYLENE SCHEIDE** |
| **BRANCH BANKING & TRUST** | ) |
| **COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

1.     My name is Gaylene Scheide, and I am of sufficient age, have a sound mind, and suffer from no disabilities that would prevent me from giving this Declaration.

2.     I am employed by Branch Banking and Trust Company ("BB&T") as a Financial Center Manager for the Providence Road Branch.

3.     As of the beginning of 2003 and leading up to the termination of Timothy N. Ellerby in August of 2003, I was employed by BB&T as a Retail Services Assistant ("RSA"). One of my responsibilities was to assist lenders in my cluster with loan servicing and loan processing. I assisted lenders in making sure that all the necessary loan documentation was complete and accurate, including any documents needed to perfect the bank's interest in any applicable collateral. I also helped in the process of loan applications and the gathering of pertinent information from the customers requesting the loans.

4.     In the early part of 2003, I was made aware that some lenders within the Charlotte region had high exception rates and I was told that I would be one of the RSAs

tasked with the responsibility of assisting these lenders in their efforts to clear outstanding exceptions and lower their exception rates. When Chellie Phifer became the Financial Center Leader for the South Park cluster, I began to assist Ellerby and the other lenders within that cluster in their loan processing work. I also began to assist them in their efforts to clear outstanding exceptions and lower their respective exception rates. I recall that Ellerby had a high exception rate and a large number of loan documentation exceptions and lien exceptions.

5.     There are two types of exceptions: Loan Documentation Exceptions and Lien Exceptions. Loan Documentation Exceptions occur when there are defects in the loan paperwork, such as incomplete contact information, missing signatures, missing forms, incomplete forms, erroneous calculations, etc. Lien Exceptions occur when the bank does not perfect its security interests in any collateral that secures the particular loan at issue.

6.     When I initially began working with Ellerby on his exceptions, he was helpful, in that he went over the exceptions with me and faxed deeds of trust to me to let me know that specific exceptions had been taken care of. At some point, however, that changed and Ellerby began to do little, if anything, to help me clear outstanding exceptions.

7.     For example, Ellerby frequently told me that he was going to take certain steps to clear exceptions, but then those exceptions remained uncleared. It was apparent to me he was not following through with his commitments. In addition, Ellerby told me on more than one occasion not to call clients in an effort to clear up exceptions and that

2

he would take care of the matter(s). On these occasions, however, the exceptions were not cleared.

8.     I believed that Ellerby was really not intent on working with me to clear the exceptions and, in fact, often seemed working against my efforts in that he would not honor the commitments that he had made and effectively prevented and/or hindered me from clearing the exceptions on my own.

9.     When Chellie Phifer asked me about our progress in clearing outstanding exceptions, I expressed my concerns and frustration to Phifer regarding Ellerby's commitment to this process.

10.     Even though Ellerby, Phifer, and I eventually had weekly meetings regarding Ellerby's exception rates, Ellerby's behavior regarding these exceptions did not change. I told Phifer about our continuing efforts to reduce the exceptions, and again informed her that I was clearing the exceptions without Ellerby's help, that Ellerby was not doing what he said he was going to do, and that because of Ellerby's lack of effort, I was having to spend a lot more time and effort to clear the exceptions.

11.     While there were numerous examples of Ellerby's failure to follow through with commitments and assist in the effort to clear exceptions, one example in particular stands out and was actually discovered after Ellerby left the bank.   After Ellerby was no longer employed at BB&T, I was researching invoices for the Woodlawn branch and discovered an invoice dated August 4, 2003 from J. Eric Kinberg, attorney at law.   The invoice was for $638.00 and pertained to the recording fees necessary for Deeds of Trust. I noticed on the invoice that there was several client names for whom we were missing certain recorded Deeds of Trust and were, in fact, uncleared exceptions.

3

12. I telephoned Kinberg's office and spoke to a paralegal there named Beth. She informed me that they had all the original signed Deeds of Trust and that she had been holding them for some time. She told me that the reason the deeds had not been recorded was that although she had contacted Ellerby several times for approval to perform the necessary title searches and record the deeds, Ellerby told her to "hold off" until he could determine what the expense for this service was. Had Ellerby simply provided this approval, this would have cleared numerous exceptions that were on the documentation exception report and would have substantially decreased any risk to the bank on the loans at issue. This behavior was typical of Ellerby's lack of initiative in helping me clear outstanding exceptions.

13. In addition to Ellerby, I assisted other lenders in the South Park cluster with their exceptions. Unlike Ellerby, the other lenders were helpful and cooperative in the effort to clear outstanding exceptions. This was not the case with Ellerby.

14. I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of May, 2005.

Gaylene Scheide

4